# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00161-CR

**Joshua Thompson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT NO. 9034175, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Joshua Thompson guilty of injury to a child and aggravated assault, for which it imposed prison terms of twenty-six and twenty years, respectively. *See* Tex. Pen. Code Ann. §§ 22.02, 22.04 (West Supp. 2005). In two points of error, appellant contends the trial court erred by instructing the jury on the law of transferred intent with respect to the injury to a child offense, and by failing to require a culpable mental state with respect to his use of a deadly weapon in the aggravated assault offense. We will overrule these points and affirm the convictions.

### *Background*

Appellant's father, Hank Thompson, was the pastor at Capitol City Baptist Church in Austin. Appellant was the associate pastor in charge of the church's Spanish-speaking ministry. Appellant's twin brother, Caleb Thompson, was also active in the church. The brothers were twenty-

two years old. The complainant, L.G., attended the church with his stepfather, mother, and sister. L.G. was eleven years old.

On the morning of July 3, 2002, L.G. was taking part in a children's Bible-study program at the church. His teacher, believing that he was misbehaving, reported him to appellant. After a brief meeting with L.G. at the church, appellant drove the boy to Caleb's nearby residence. The child testified that after they arrived, he waited in the living room while appellant went outside and cut a branch from a tree. When appellant returned, he took L.G. to a bedroom, directed him to lie across the bed, and began to hit him across the back with the branch. L.G. testified that he cried out, tried to turn away from the blows, and begged appellant to stop hitting him. Appellant told the boy to stop squirming and continued to hit him. When the boy began to cry, appellant turned on a radio and turned up the volume.

L.G. testified that appellant eventually went to the telephone and called Caleb for assistance. Other testimony, including that of appellant and Caleb, was to the effect that Caleb had been at the church and had gone to the house with appellant and L.G. In either event, Caleb entered the bedroom and held L.G.'s arms to prevent him from moving or deflecting appellant's blows. L.G. said that appellant continued to hit him until the branch he was using was shredded. Appellant ordered the boy to pick up the pieces of the stick and take them to the trash can. L.G.'s nose was bleeding, and when he returned to the bedroom, appellant and Caleb were cleaning blood from the carpet.

L.G. followed appellant back to the living room. He testified that he was having difficulty standing and that his vision was blurred. Appellant went outside and cut another branch.

Appellant and Caleb then returned the boy to the bedroom and the beating continued. This time, appellant sat on L.G.'s legs as he hit him. Caleb continued to hold the boy's arms. L.G. estimated that appellant struck him more than one hundred times over a period of one to one-and-a-half hours. L.G. testified that appellant was praying "to get the devil out of me" as he beat him.

L.G.'s parents worked cleaning houses, and had gone to work that morning after dropping off their children at the church. L.G.'s stepfather testified that shortly after 11:00 a.m., he received a telephone call from appellant, who said that "he had a big problem that he wasn't able to fix." L.G.'s parents returned home, where they found Caleb Thompson's car sitting in the driveway. Appellant got out of the car and told L.G.'s stepfather that he "tried to get the devil out, but he wasn't able to." The stepfather testified that appellant advised him to hit his son for two more hours. Appellant then went to the car, opened the door, and pulled out L.G. The boy was unable to stand, but appellant said that the child was "faking it." The witness helped his son into the house as appellant and Caleb quickly drove away.

L.G. told his parents that appellant and Caleb had hit him on the back. His stepfather testified that when they lifted the boy's shirt to look, they saw "something horrendous" and his wife began to scream. They immediately called the police and EMS.

Austin firefighter Tim Bailey was the first emergency worker to arrive at the house. Paramedic Randy Trinkle arrived a few minutes later. Both men testified that when they saw L.G.'s back, they involuntarily exclaimed, "Oh, my God." Trinkle testified that the child's back, from his neck to his buttocks, was one huge bruise. It was the worst bruising he had ever seen. L.G.'s blood

3

pressure was low, his heart rate was fast, and he appeared to be undergoing hypovolemic shock, an indication that he was losing blood.

L.G. was taken to the emergency room and then to intensive care, where he remained for five days. His attending physician was Renee Jankowski. She testified that L.G.'s "back was almost one confluent sheet of bruising and superficial scratches that were oozing a little bit of blood. The bruising was quite severe and what we call palpable—it was raised up—which tells you that there is a lot of tissue edema underneath and suggests that there is deeper tissue injury." Jankowski testified that L.G.'s urine was "coca-cola colored," which indicated to her that the blood contained myoglobin, a sign of muscle necrosis. She explained that muscle cells release myoglobin when they die as a result of trauma. This substance collects in the kidneys and can cause renal failure.

Jankowski testified that L.G. had bruises on his back, buttocks, and legs that were equally fresh. All the wounds had a linear pattern. She was of the opinion that the boy had been beaten with a long, thin object hundreds of times. She said that if L.G. had not received prompt medical attention, he would have died from renal failure.

Appellant testified that he had been given permission by L.G.'s parents to physically discipline him. He said that he and Caleb took the boy to Caleb's house because corporal punishment was against church policy. Appellant denied hitting L.G. for an hour; he estimated that the beating lasted for about ten minutes. He did not know how many times he struck the child, but denied that it was a hundred or more. He also denied using more than one "switch," but admitted hitting the boy "very hard." He said that he "felt it was wrong" at the time, but that he believed it was necessary discipline. He conceded that in retrospect, it was a "terrible, terrible idea."

4

Caleb Thompson testified that appellant told him that "he was going to discipline a child" and needed a witness. He thought this meant that appellant was going to spank the child on the buttocks. He claimed to be surprised when appellant began hitting L.G. on the back. Caleb admitted holding the boy's arms, saying that he just "froze" as the beating continued. He estimated that appellant struck the boy about twenty-five times. He acknowledged that appellant's conduct was inappropriate, excessive, and brutal.

Appellant and Caleb Thompson were indicted for injury to a child and aggravated assault. They were convicted following a joint trial.[1]

### Transferred Intent

Penal code section 6.04(b) is commonly referred to as the "transferred intent" statute, although that term does not appear in the statute and it incorporates all four culpable mental states. The statute provides:

> A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:
>
> (1)   a different offense was committed; or
>
> (2)   a different person or property was injured, harmed, or otherwise affected.

---

[1] We affirm Caleb Thompson's convictions in *Thompson v. State*, No. 03-04-00162-CR (Tex. App.—Austin Dec. 8, 2005, no pet. h.) (not designated for publication).

Tex. Pen. Code Ann. § 6.04(b) (West 2003).[2] In his first point of error, appellant contends the trial court erred by permitting the jury to apply section 6.04(b)(1) in determining whether he was guilty of injury to a child as alleged in the indictment. The State agrees with appellant that the section 6.04(b)(1) instructions should not have been given, but asserts that the error was harmless. We conclude, however, that no error is presented.

Count one of the indictment alleged that appellant "intentionally and knowingly cause[d] serious bodily injury to [L.G.], a child 14 years of age or younger, by striking [him] with a stick, a branch and an object unknown." *See* Tex. Pen. Code Ann. § 22.04(a)(1), (e). The court's jury charge contained appropriate definitions of the relevant culpable mental states. *See* Tex. Pen. Code Ann. § 6.03(a), (b) (West 2003). In addition, over appellant's objection, the court instructed the jury that "[a] person is criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different offense was committed." *Id*. § 6.04(b)(1). The court then, over appellant's further objection, applied the law to the facts in two alternative paragraphs that authorized appellant's conviction for injury to a child "as alleged in Count 1" if the jury found that appellant either: (1) "intentionally or knowingly cause[d] serious bodily injury to [L.G.]," or (2) "intending to cause bodily injury . . . did then and there cause serious bodily injury to the said [L.G.]." The jury returned a general verdict of guilty "as alleged in the indictment."

---

[2] Judge Clinton summarized the background of section 6.04(b) in *Prince v. State*, 861 S.W.2d 913, 915-17 (Tex. Crim. App. 1993) (Clinton, J., dissenting).

6

Injury to a child is a "result of conduct" offense, that is, the culpable mental states required for the offense relate to the result of the defendant's conduct. *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985); *Beggs v. State*, 597 S.W.2d 375, 377 (Tex. Crim. App. 1980). Four different punishment grades apply to the offense, depending on the seriousness of the injury and the culpable mental state with which it is inflicted:

• A person commits a first-degree felony if he intentionally or knowingly causes serious bodily injury to a child.

• A person commits a second-degree felony if he recklessly causes serious bodily injury to a child.

• A person commits a third-degree felony if he intentionally or knowingly causes bodily injury to a child.

• A person commits a state jail felony if he recklessly causes bodily injury to a child or if with criminal negligence he causes either bodily injury or serious bodily injury to a child.

Tex. Pen. Code Ann. § 22.04(a), (e), (f), (g). Appellant argues that by authorizing his conviction for a first-degree felony based on a finding that he acted with the intent to cause bodily injury, the trial court disregarded the statutory framework of the offense and misapplied section 6.04(b)(1). He argues more broadly that section 6.04(b)(1) should be given a restrictive interpretation in order to avoid what he considers to be absurd results that the legislature could not possibly have intended. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

The court of criminal appeals applied section 6.04(b)(1) in a closely analogous case soon after the adoption of the present penal code. *See Honea v. State*, 585 S.W.2d 681, 684-85 (Tex. Crim. App. 1979). Honea was convicted of aggravated robbery on an indictment alleging that he

7

intentionally and knowingly caused serious bodily injury in the course of committing robbery. *Id*.; *see* Tex. Pen. Code Ann. § 29.03(a)(1) (West 2003). The evidence showed that Honea and an accomplice bound and gagged the victim, took his wallet, and left him lying on the floor of a barn. *Honea*, 585 S.W.2d at 684. The victim thereafter inhaled dust which caused him to cough and then vomit, and he died after aspirating vomitus. *Id*. Honea urged on appeal that the State failed to prove that he intended to kill the victim. The court rejected this argument:

> It is well settled that one who, intending to commit a felony, accidentally commits another felony, is guilty of the felony actually committed. The intent to commit the contemplated offense transfers to the offense in fact committed. See V.T.C.A. Penal Code, Sec. 6.04, which is derived from Art. 42, V.A.P.C.; *Sargent v. State*, 518 S.W.2d 807 (Tex. Crim. App. 1975); *Hilliard v. State*, 513 S.W.2d 28 (Tex. Crim. App. 1974). [Honea] clearly intended to rob [the victim]; his acts resulted in the offense of aggravated robbery, and he is guilty of that offense. No variance exists.
>
> [Honea] contends that the State only proved that [he] acted "recklessly," or with "criminal negligence," and that a fatal variance exists for this reason. Our answer to the preceding contention answers this contention as well.

*Id*. at 685.

*Honea* compels the conclusion that if a defendant intends to cause bodily injury to another, but his conduct actually results in serious bodily injury, he is under section 6.04(b)(1) criminally responsible for intentionally causing serious bodily injury. Appellant does not deny that he caused serious bodily injury to L.G. If in fact appellant intended to cause L.G. bodily injury, the only difference between what actually occurred and what appellant desired is that a different offense, or a different grade of the same offense, was committed.

8

Appellant asserts that the application of section 6.04(b)(1) disrupts the statutory scheme by which injury to a child is subject to different levels of punishment based on the seriousness of the injury and the culpable mental state of the actor. He argues that if section 6.04(b)(1) applies, the notion of recklessly causing serious bodily injury to a child is rendered a nullity. We disagree with both contentions. The application of section 6.04(b)(1) does not disrupt the statutory punishment scheme, but merely adds an additional manner of proving intentional serious bodily injury to a child. *See Hilliard v. State*, 513 S.W.2d 28, 32 (Tex. Crim. App. 1974) (construing predecessor statute). A person who injures a child without intending or contemplating doing so, but under circumstances showing that he consciously disregarded a substantial and unjustifiable risk of causing injury, is properly convicted of recklessly causing either bodily injury or serious bodily injury depending on the seriousness of the injury.

The State suggests that section 6.04(b)(1) was improperly applied in this cause because section 22.04 requires proof that the defendant intended to cause serious bodily injury in order to sustain a conviction for first-degree felony injury to a child. But section 6.04(b)(1) does not dispense with the intent element. Instead, as noted above, the statute merely provides an additional method for proving such intent. *Id*. Under section 6.04(b)(1), appellant's intent to cause bodily injury to L.G. "transferred" to the serious bodily injury that actually resulted from appellant's conduct. *See Honea*, 585 S.W.2d at 685. As a matter of law, appellant was shown to have intended serious bodily injury.

Appellant argues that section 6.04(b)(1) must be construed restrictively, asserting that a literal interpretation of the statute would lead to absurd results. *See Boykin*, 818 S.W.2d at 785.

9

In this cause, however, we must decide only whether section 6.04(b)(1) was properly applied in this prosecution for intentionally causing serious bodily injury to a child. We hold, under the authorities cited above, that it was. We express no opinion regarding the application of section 6.04(b)(1) under other circumstances.

Point of error one is overruled.

### *Deadly Weapon*

Count two of the indictment alleged aggravated assault with a deadly weapon. *See* Tex. Pen. Code Ann. § 22.02(a)(2). The trial court's jury charge tracked the indictment and instructed the jurors to convict appellant if they found that he "intentionally or knowingly cause[d] bodily injury to [L.G.], by striking [him] with a stick, a branch, or an object unknown . . . and [appellant] did then and there use or exhibit a deadly weapon, to-wit: a stick, a branch, or an object unknown . . . which in the manner of its use or intended use was capable of causing death or serious bodily injury." In his second point of error, appellant contends that this instruction was fundamentally erroneous because it authorized his conviction for aggravated assault with a deadly weapon without requiring a culpable mental state with respect to the weapon's use. Appellant argues that the court should have required the jury to find that he employed the stick, branch, or other object with the intent to cause death or serious bodily injury.

"[A]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury" is a deadly weapon. Tex. Pen. Code Ann. § 1.07(a)(17)(B) (West Supp. 2005). The statute does not require that the actor actually intend death or serious bodily injury. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). It is sufficient that the actor uses or

10

intends to use the object in a manner capable of causing death or serious bodily injury. *Id.*; *and see*

*Bailey v. State*, 38 S.W.3d 157, 159 (Tex. Crim. App. 2001). There was no error in the charge.

Point of error two is overruled.

The judgments of conviction are affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: December 8, 2005

Publish